J-S80006-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| D.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| L.M.F. | |
| v. | |
| J.F. AND B.F. | No. 983 MDA 2016 |

Appeal from the Order Entered May 17, 2016
In the Court of Common Pleas of Lancaster County
Civil Division at No(s): 10-02282

BEFORE:  LAZARUS, J., STABILE, J., and RANSOM, J.

MEMORANDUM BY LAZARUS, J.:                **FILED DECEMBER 30, 2016**

D.B. ("Father") appeals from a final custody order, entered on May 17, 2016, in the Court of Common Pleas of Lancaster County, denying his petition for relocation. The order also modified a prior custody order, awarding J.F. and B.F. ("maternal grandparents"), L.M.F. ("Mother"), and Father shared legal custody of D.G.F.-B. (DOB February 2010) ("Child"), and awarding primary physical custody of Child to Father and shared partial physical custody to maternal grandparents and Mother, provided, however, that Father does not relocate.  The order provided that if Father chooses to relocate, maternal grandparents and Mother will share primary physical custody of Child and Father will have partial physical custody of Child.  The court also removed a provision from the prior order that required maternal

grandparents to supervise Mother's custody periods.[1]  After our review, we affirm.

Father filed a complaint for custody in March 2010, approximately one month after Child's birth.  Following a hearing, the court entered an order, dated November 4, 2010, granting Mother and Father shared legal custody of Child, granting Mother primary physical custody of Child, and granting Father partial physical custody of Child.  The court also ordered Father to participate in a course of anger management counseling and directed the parties to participate in a review custody conference with a custody conference officer.  In lieu of the conference, however, Mother and Father, by counsel, agreed to an order, dated June 9, 2011, that enlarged Father's periods of partial physical custody and required a review conference in six months.

Thereafter, Father, concerned about Mother's drug abuse, filed a petition seeking primary custody.  Maternal grandparents filed a petition to

---

[1] The court had entered prior orders restricting Mother's custody periods to supervised visitation in light of her drug abuse and, thereafter, precluded contact between Mother and Child until Mother successfully completed a drug rehabilitation program. Thereafter, the court allowed supervised visitation, with maternal grandparents as supervisors, provided Mother continued her methadone treatment.  Mother was absent from Child's life for about one year during her drug addiction, from November 2014 until November 2015, but, as of the time of the May 2016 custody/relocation hearing, she had been drug free for fifteen months and continues in a methadone maintenance program.  *See* N.T. Hearing, 5/5/16, at 109, 165-69, 176, 180.

intervene, which was unopposed. The court entered an order on October 25, 2011, granting maternal grandparents' request to intervene, granting shared legal custody of Child to all parties, and granting primary physical custody of child to maternal grandparents. The court granted Father partial physical custody and ordered that Mother's periods of supervised custody at the home of maternal grandparents.

On February 15, 2012, at Father's request, the court held another review hearing. On August 1, 2012, the court entered an order granting shared legal custody of Child to Father and maternal grandparents, primary physical custody to Father, and partial physical custody to maternal grandparents. The court granted supervised partial physical custody to Mother, with maternal grandparents as supervisors.

On June 11, 2014, maternal grandparents filed a petition for modification. The court held a hearing on October 24, 2014. On November 4, 2014, the court issued an order granting shared legal custody of Child to Father and maternal grandparents, primary physical custody of Child to Father, and partial physical custody of Child to maternal grandparents. The court ordered Mother not to have contact with Child until she successfully completed a drug rehabilitation program. One year later, following a hearing, the court determined Mother did not pose a threat of harm to Child and granted her supervised physical custody provided she maintained her daily methadone treatment program.

On January 20, 2016, Father filed a notice of proposed relocation. *See* 23 Pa.C.S.A. § 5337(c). Following a custody and relocation hearing, the court issued the order, denying Father's petition for relocation and setting forth the custody awards, stated above, from which Father now appeals. Father raises the following issues for our review:

1. Whether the trial court erred and abused its discretion by awarding Mother and maternal grandparents, who reside in separate homes, shared primary physical custody of Child?

2. Whether the maternal grandparents have standing to be awarded primary physical custody of Child?

3. Whether the court erred and abused its discretion by denying Father's request to relocate?

4. Whether the court erred and abused its discretion by finding Father's request to move to be a relocation under section 5337 of the Child Custody Act?

Our standard and scope of review are as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court. When a trial court orders a form of custody, the best interest of the child is paramount. The factors to be considered by a court when awarding custody are set forth at 23 Pa.C.S. § 5328(a).

***E.R. v. J.N.B.***, 129 A.3d 521, 527 (Pa. Super. 2015) (citations and quotations omitted). Further,

> When deciding a petition to modify custody, a court must conduct a thorough analysis of the best interests of the child based on the relevant Section 5328(a) factors. All of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order. Section 5337(h) requires courts to consider all relocation factors. The record must be clear on appeal that the trial court considered all the factors.

***A.V. v. S.T.***, 87 A.3d 818, 822-23 (Pa. Super. 2014) (citations and quotations omitted).

Father argues that the court erred in characterizing his "move" as a relocation. He claims that since he was planning to move from East Earl in Lancaster County to Downingtown, in Chester County, which he states is simply a twenty-six minute drive, without traffic, the move should not be subject to relocation review. Father also claims that his move would not alter Mother's and maternal grandparents' custodial time and that he would assist them with transportation.[2] The decision regarding whether to apply the relocation factors is within the court's discretion. ***Bednarek v.***

---

[2] The court noted that, with traffic, the commute to and from East Earl to Downingtown increases to an hour. N.T. Custody/Relocation Hearing, 5/5/16, at 16, 194, Findings of Fact, 7/27/16, ¶¶ 14, 15. However, it is not so much the time and distance in this case, but the fact that the court found Father's motivation to relocate a "sham." Trial Court Opinion, 7/27/16, at 21. The court concluded Father's plan to move farther from his primary place of business "a direct response to Mother's return to the Child's life and his desire to eliminate, or at least minimize, Mother's and Maternal Grandparents' role in the Child's life." ***Id.*** at 20-21.

*Vasquez*, 830 A.2d 1267 (Pa. Super. 2003). The distance is a consideration of course, but the focus in characterizing a relocation is on how that move will affect the opposing parties' custodial rights. *See* 23 Pa.C.S.A. § 5322 (defining "relocation" as a "change in a residence of the child which significantly impairs the ability of a nonrelocating party to exercise custodial rights.").

As the trial court points out, Child has been in therapy for adjustment disorder since 2014, is currently doing "really well" in Kindergarten at Blue Ball Elementary School, and that a change of schools "would be traumatic for" for him. N.T. Custody/Relocation Hearing, 5/5/16 at 75, 190-91, 228-29; Findings of Fact, 7/27/16, at ¶¶ 7-8, 45. Father acknowledged how well Child was doing. He stated that Child's teachers "have actually advanced him to first grade reading level on certain days" and that he had "great report cards." N.T. Custody/Relocation Hearing, 5/5/16, at 14. Further, Father added that "[a]ccording to the teacher, he's pretty much a leader of the group." *Id.*

Child wishes to remain in the location where maternal grandparents reside, and he wishes to remain in the school he presently attends. *Id.* at 86-87, 217; Findings of Fact, 7/27/16, at ¶ 48. Additionally, the court noted that: Child enjoys a strong relationship with maternal grandparents; that Child has nightmares that maternal grandparents "will be killed[;]" that Child gets "very scared" when they come to court; that Child fears he will not ever see Mother or maternal grandparents again after court; and, that if

- 6 -

Father is permitted to relocate with Child, Child's emotional issues "would be exacerbated." N.T. Hearing, 5/5/16, at 75-79; Findings of Facts, 7/27/16, at ¶¶ 44-45, 48.

The court also found that Father, who operates a convenience store in Honeybrook, a short distance from maternal grandparents' residence, was disingenuous in his reasons for relocating. Father asserted his motivation was to be closer to his father's convenience store in Norristown, Montgomery County, although Father's involvement with that store has been negligible. Father also states that Child will benefit from being closer to his paternal grandparents. The court acknowledged that if Father moved he would be closer to his parents, but characterized that as "slightly closer" than he is presently. N.T. Hearing 5/5/16, at 29-31; Findings of Fact, 7/27/16, at ¶ 28.

Furthermore, the court found that the evidence was "overwhelming that Father continues to harbor an animus toward Mother as well as toward the Maternal Grandmother." Trial Court Opinion, 7/27/16, at 19. Additionally, the court characterized Father's repeated attempts to "poison" Child's relationship "with the maternal side of the Child's family" as "horrifying." *Id.*

It is critical to note that the Honorable Jeffrey J. Reich, who has been involved with this family's custody matters for six years, noted that Mother has "grown tremendously" and that, unfortunately for Child, "Father perceives Mother's rehabilitation, maturation, and growing sense of

responsibility as a threat to his plan to monopolize the Child culturally and spiritually." Trial Court Opinion, 7/27/16, at 21. Essentially, the court determined that Father's reasons for relocation were not in Child's best interests and did not support disruption of Child's life. As aptly stated by the trial court:

> This Court's persistent approach has been that the Child deserves the benefit of having both elements of his culturally and religiously diverse heritage understood by him and appreciated by him and by those who are significant to him (notably, his parents, his half-brother, and his grandparents on both sides).

Trial Court Opinion, 7/27/16, at 21.

After careful review of the record, the parties' briefs and the applicable law, and Judge Reich's well-reasoned opinion, we conclude that Father's issues merit no relief. The court properly addressed both the relocation factors under section 5337(h) of the Child Custody Act, as well as the best interest factors enumerated in section 5328(a). *See* 23 Pa.C.S.A. §§ 5337(h), 5328(a); *A.V.*, *supra*. The court provided a thorough analysis of Child's best interests based on the relevant factors. We discern no abuse of discretion or error of law. *E.R.*, *supra*. Accordingly, we affirm based on the trial court's opinion of July 27, 2016, which incorporates the court's findings and order of May 17, 2016.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/30/2016

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

D██████ B███████
                        Plaintiff

            v.                              No. CI-10-02282

L██████ M. F███████████
                        Defendant

            v.

J████ F█████████ and
B█████ F█████████
            Additional Defendants

## OPINION *SUR* APPEAL

This is an appeal of the Court's decision in a child custody case. A Final Custody Order was entered on May 17, 2016. The Plaintiff (hereinafter, "Father") filed a timely appeal on June 16, 2016.

## PROCEDURAL HISTORY

Father filed a Complaint for Custody on March 5, 2010, approximately one month after the birth of the subject child, D█████ G████████ F█████████-B████████ (date of birth February 3, 2010; hereinafter, the "Child"). The Court held a Custody Hearing on October 20, 2010. By Order dated November 4, 2010, the parents were granted shared legal custody of the Child, Defendant L████████ M. F███████ (hereinafter, "Mother") was granted primary physical custody of the Child, and Father was granted partial physical custody of the Child. Additionally, Father was ordered

to participate in a course of anger management counseling, and the parties were directed to participate in a review custody conference with a custody conference officer. However, in lieu of the conference, the parents, by counsel, agreed to the entry of an Order dated June 9, 2011, which enlarged Father's periods of partial physical custody of the Child and required a review conference with the Court after six months. At that point in time, the Additional Defendants, John and Brenda Fadsfdsdms (hereinafter, "Maternal Grandparents") were not parties to the custody action.

During the interim after the June 9, 2011, Order and the review conference (by then scheduled for December 7, 2011), Father raised concerns about Mother via a Petition for Temporary Order dated October 14, 2011. An Order was issued after a family business court presentation on October 25, 2011, which granted Maternal Grandparents motion to intervene as parties (which was unopposed), granted shared legal custody of the Child to all parties, and granted primary physical custody of the Child to Maternal Grandparents. Mother was to exercise her periods of physical custody of the Child at the home of Maternal Grandparents. Father was granted partial physical custody of the Child. Subsequently, on November 17, 2011, at the request of Father's counsel, the December 7, 2011, review hearing was rescheduled to February 15, 2012. Following that hearing, the

-2-

Court issued an Interim Order on February 22, 2012, which granted shared legal custody of the Child to Father and Maternal Grandparents, primary physical custody of the Child to Maternal Grandparents, and partial physical custody of the Child to Father. Mother was granted supervised physical custody at the home of Maternal Grandparents. Thereafter, following a third hearing in the case, the Court issued an Order with Findings dated August 1, 2012, and filed August 2, 2012, which granted shared legal custody of the Child to Father and Maternal Grandparents, primary physical custody of the Child to Father, and partial physical custody of the Child to Maternal Grandparents. Mother was granted supervised periods of partial physical custody at the home of Maternal Grandparents.

On June 26, 2013, Father filed a Petition for Modification of Custody Order. On September 11, 2013, Maternal Grandparents and Mother filed a Petition for Contempt of Order Dated August 1, 2012, and a Petition for Modification of Order Dated August 1, 2012. On January 13, 2014, by agreement of the parties, all of these petitions were withdrawn, with the understanding that the Order of August 1, 2012, was to remain in effect.

On June 11, 2014, Maternal Grandparents filed a Petition to Modify Custody Order and Request for Special Relief. After a hearing before the Court on October 24, 2014, an Order (with Findings) was issued on November 4, 2014, which granted shared

-3-

legal custody of the Child to Father and Maternal Grandparents, primary physical custody of the Child to Father, and partial physical custody of the Child to Maternal Grandparents. Mother was ordered to have no contact with the Child until she successfully completed a drug rehabilitation program.

On September 29, 2015, Mother and Maternal Grandparents filed a Petition to Modify Custody Order and Request to Schedule a Criminal History Hearing for Natural Mother. A criminal history hearing was held on November 6, 2015, and on November 13, 2015, the Court issued an Order which found that Mother does not pose a threat of harm to the Child on the condition that Mother maintains her daily methadone treatment program and which scheduled a custody conciliation conference. Mother was granted supervised physical custody with Maternal Grandparents being the supervisors.

On January 11, 2016, Father filed an Affidavit of Service of Notice for Proposed Relocation and Counter-Affidavit. Maternal Grandparents and Mother filed a Counter-Affidavit Regarding Relocation on January 20, 2016. Father's Notice of Proposed Relocation was filed on January 21, 2016. A custody and relocation Hearing was held on May 5, 2016. Thereafter, the Court issued an Order (with Findings) on May 17, 2016. It is this Order which is the subject of Father's present appeal to the Superior Court.

-4-

## FINDINGS OF FACT

1. The Child was born February 3, 2010. (Petition to Modify Custody Order and Schedule a Criminal History Hearing for Natural Mother)

2. D██████ B██████ is the father of the Child. (Petition to Modify Custody Order and Schedule a Criminal History Hearing for Natural Mother)

3. L██████ F██████ is the mother of the Child. (Petition to Modify Custody Order and Schedule a Criminal History Hearing for Natural Mother)

4. J███ and B█████ F█████████ are the maternal grandparents of the Child. (Petition to Modify Custody Order and Schedule a Criminal History Hearing for Natural Mother)

5. Father has had primary physical custody of the Child since August 2, 2012. (N.T. 5/5/2016 at page 13; Order filed August 2, 2012)

6. The Child attends kindergarten at Blue Ball Elementary School. (N.T. 5/5/2016 at page 13)

7. The Child is doing very well in school. (N.T. 5/5/2016 at page 14)

8. The Child has been in therapy since October 2014 for adjustment disorder with mixed disturbance of emotions and conduct. (N.T. 5/5/2016 at pages 17-18 and pages 76-77)

-5-

9. Father has resided in a single family home in East Earl, Pennsylvania, for the entire time he has had primary custody of the Child. (N.T. 5/5/2016 at pages 14-15 and 34)

10. Father sold his residence in East Earl prior to the custody and relocation hearing. At the time of the hearing on May 5, 2016, Father remained in the same residence as a tenant. (N.T. 5/5/2016 at page 34)

11. Father sought the Court's approval of his relocation. (N.T. 5/5/2016 at page 15)

12. Father is seeking to relocate to an apartment in Downingtown, Pennsylvania. (N.T. 5/5/2016 at pages 15-16)

13. Maternal Grandparents reside about two miles from Father's convenience store in Honeybrook, Pennsylvania. Their home is located between the Honeybrook convenience store and Father's East Earl residence. (N.T. 5/5/2016 at page 15)

14. MapQuest suggests the travel time from the Maternal Grandparents' home to Father's proposed new location is twenty-six minutes. (N.T. 5/5/2016 at page 16)

15. During peak traffic times, the same travel time increases to one hour. (N.T. 5/5/2016 at page 194)

16. If the relocation is granted, the Child would have to wake up one hour earlier on a school day when Maternal Grandparents have a period of physical custody. (N.T. 5/5/2016 at pages 198-199 and 219)

-6-

17. Maternal Grandfather is unable to assist with transportation of the Child on school days due to his work schedule. (N.T. 5/5/2016 at page 228)

18. At Father's new residence, the Child would attend school in the Downingtown School District. (N.T. 5/5/2016 at page 24)

19. The Downingtown School District is a much more populous district than the district which the Child presently attends. (N.T. 5/5/16 at page 191)

20. The change of schools would be traumatic for the Child. (N.T. 5/5/2016 at pages 190-191 and pages 228-229)

21. Father currently operates a convenience store in Honeybrook, Pennsylvania, which has been his primary business since 2007. (N.T. 5/5/2016 at pages 25 and 46)

22. Father intends to extend his lease on the Honeybrook store for an additional ten years, to 2027) (N.T. 5/5/2016 at pages 146-147)

23. Father desires to move to Downingtown, Pennsylvania. His stated reason is that he will be more conveniently able to work two hours per day in his father's convenience store located in Norristown, Pennsylvania. (N.T. 5/5/2016 at pages 25-27)

24. Father has often in the past driven to the Norristown store from his present residence in East Earl. (N.T. 5/5/2016 at page 195)

25. Father's primary source of income (i.e., the Honeybrook store) will be approximately forty minutes away by motor vehicle from Father's new residence in Downingtown. (N.T. 5/5/2016 at page 50)

26. Father's cousin has managed the convenience store in Norristown for the past ten years. (N.T. 5/5/2016 at page 47)

27. Father's father has owned the Norristown convenience store for approximately twenty-five years and has done well without Father's assistance. (N.T. 5/5/2016 at page 48)

28. Father's extended family would be slightly closer to the Father if Father relocates to Downingtown, Pennsylvania. (N.T. 5/5/2016 at pages 29-31)

29. Father states the relocation will enable the Child to be closer to the paternal extended family and will increase the Child's opportunities for physical fitness. (N.T. 5/5/2016 at page 35)

30. Father's desire to move to Downingtown, Pennsylvania, was expressed for the first time only after Mother was granted supervised custodial periods with the Child following her estrangement from the Child due to her previously uncontrolled drug addiction. (N.T. 5/5/2016 at pages 195-196 and 233)

31. Father provided few details about the apartment complex or the specific apartment where he will be living in Downingtown, Pennsylvania, or about the school the Child would be attending if

the Child were to attend school in the Downingtown Area School District. Father's reasoning was that it be a waste of Father's time to provide the Court with facts regarding his apartment complex and the Child's school if he cannot take the Child with him to his new location. (N.T. 5/5/2016 at pages 36-39)

32. By the time of the custody and relocation hearing and without knowing whether the Court would approve his relocation request, Father had signed a lease for the apartment in Downingtown, Pennsylvania. (N.T. 5/5/2016 at pages 40 and 268)

33. Maternal Grandparents effectively had primary physical custody of the Child from his birth until he was two years of age. (N.T. 5/5/2016 at page 68)

34. Father is mad about the Maternal Grandparents involvement with the Child. (N.T. 5/5/2016 at pages 69 and 71)

35. In Father's view, should the Court not approve Father's request to move with the Child to Downingtown, Father will move anyway and the Court should grant the Maternal Grandparents primary custody of the Child, but also in that event the Maternal Grandparents should pay Father's rent for his Downingtown apartment and compensate Father for whatever his future earnings at the Norristown convenience store might be. (N.T. 5/5/2016 at page 40)

36. If the Court approves Father's relocation request, Father indicated that he would provide transportation for the

Child both to and from the Maternal Grandparent's residence on school days and he would expect that Maternal Grandparents provide the transportation both to and from his residence for their weekend periods of physical custody of the Child. (N.T. 5/5/2016 at pages 51-52) *NO*

37. Father listed an unrelated third party, his acquaintance Holly Loveland, as the emergency contact for the Child in the Child's school record. (N.T. 5/5/2016 at page 61)

38. Father brings Holly Loveland to a majority of the Child's medical appointments. (N.T. 5/5/2016 at pages 63 and 175)

39. Holly Loveland writes letters stating disparaging comments to Maternal Grandparents, and does so with Father's knowledge. (Maternal Grandparents-Defendant's Exhibit 1 and N.T. 5/5/2016 at pages 65-70)

40. Father does not like Maternal Grandmother. (N.T. 5/5/2016 at pages 62 and 210)

41. Father tells the Child that Maternal Grandmother is "a bitch." (N.T. 5/5/2016 at page 213)

42. Father gets angry at the Child because Maternal Grandparents read the Bible with the Child. (N.T. 5/5/2016 at pages 158-159 and 239-240)

43. The Child is aware Father does not like Maternal Grandmother. (N.T. 5/5/2016 at page 92)

-10-

44. The Child has nightmares that Maternal Grandparents will be killed. (N.T. 5/5/2016 at page 75)

45. The Child suffers from adjustment disorder with mixed disturbance of emotions and conduct. If Father is permitted to relocate with the Child, these conditions would be exacerbated. (N.T. 5/5/2016 at pages 76-79)

46. Father does not believe the Child needs therapy. (N.T. 5/5/2016 at page 81)

47. Father does not trust Mother at this time. (N.T. 5/5/2016 at page 86)

48. The Child wishes to stay in the location where the Maternal Grandparents reside and wishes to remain in the school which he presently attends. (N.T. 5/5/2016 at pages 87 and 217)

49. Father's monthly rent in Downingtown, Pennsylvania will be approximately $1,165.00 (N.T. 5/5/2016 at page 130)

50. The apartment in Downingtown is smaller than the residence in East Earl where Father resided at the time of the hearing. (N.T. 5/5/2016 at page 131)

51. On November 9, 2015, Father sold his residence in East Earl. After paying off the mortgage, Father received $61,412.38 in net proceeds. (N.T. 5/5/2016 at pages 136-139)

52. Presently, Father has more than $90,000.00 in his money market account. (N.T. 5/5/2016 at page 143)

-11-

53. Father asserts he will have an economic benefit from working in another business, i.e., the Norristown convenience store, once he relocates. (N.T. 5/5/2016 at page 144)

54. It would cost less to continue to live in the Father's residence in East Earl (which Father is now renting back from his purchaser) than in the apartment which Father has leased in Downingtown. (N.T. 5/5/2016 at pages 145-146)

55. While Father admits to being blessed by his having the Honeybrook store, he does not like the one hour and fifteen minutes drive it takes for the Child and him to visit the Child's paternal grandparents. (N.T. 5/5/2016 at pages 146-148)

56. Father does not know if he is an owner on the deed to the convenience store in Norristown which is controlled by his father. (N.T. 5/5/2016 at pages 148-149)

57. Father asserts he will take over and control the Norristown store just like his store in Honeybrook, but there is no enforceable legal arrangement to assure this outcome. (N.T. 5/5/2016 at pages 149-150)

58. Mother was absent from the Child's life for approximately one year during her drug addiction, from approximately November 2014 until November 2015. (N.T. 5/5/2016 at pages 165 and 168-169)

59. As of the time of the hearing, Mother had been free of drugs for fifteen months. (N.T. 5/5/2016 at pages 109 and 176)

-12-

60. Mother continues in a methadone maintenance program. (N.T. 5/5/2016 at page 180)

61. Mother is compliant with her terms of probation and with the methadone program requirements. (N.T. 5/5/2016 at pages 182-184)

62. Mother resides in a home which is literally next door to the Maternal Grandparents' home, which proximity permits Maternal Grandmother to supervise Mother's periods of physical custody of the Child. (N.T. 5/5/2016 at pages 153-154)

63. At the time of the hearing, Mother was working part-time at two jobs. (N.T. 5/5/2016 at pages 155-156)

64. When Mother returned to the Child's environs in November 2015, the Child, upon seeing her, hugged and kissed her. (N.T. 5/5/2016 at page 165)

65. The Child's half-brother, D███████ F█████████, was born on September 11, 2015, and resides with Mother. (N.T. 5/5/2016 at page 154)

66. Father emphasizes to the Child that D███████ F█████████ is the Child's half-brother, and not his full brother. (N.T. 5/5/2016 at pages 54-55)

67. When the Child was introduced to his baby half-brother, the Child stated this was the best day of his life as he was back with Mother and he had a new baby brother. (N.T. 5/5/2016 at page 165)

-13-

68. The Child loves his half-brother; he feeds and holds him. (N.T. 5/5/2016 at page 172)

69. The Child kisses his half-brother first when arriving at Maternal Grandparents'/Mother's home and the Child's half-brother is the last person he kisses when he leaves. (N.T. 5/5/2016 at page 212)

70. Father and Maternal Grandparents attend co-parenting counseling and agree to continue to attend counseling. (N.T. 5/5/2016 at pages 18-20)

71. Father discusses with the Child matters discussed during counseling sessions. (N.T. 5/5/2016 at page 93)

72. During a co-parent counseling, it was mentioned that the Child expressed that the best day in his life was when Mother returned to his life. (N.T. 5/5/2016 at page 160)

73. Shortly after this counseling session, Father questioned the Child what the best day of his life was. (N.T. 5/5/2016 at pages 159-160)

74. The Child lied and said "When I got 'pie faced'" out of fear that Father would get very angry. (N.T. 5/5/2016 at pages 93-94 and 159-160)

75. When the Child returns to the Maternal Grandparents and Mother after a period of physical custody with Father, the Child often goes into a rage. (N.T. 5/5/2016 at pages 161-163)

76. The Child is self-conscious about his weight. Father often tells the Child that he is fat. (N.T. 5/5/2016 at pages 162-163 and 216)

77. While in the custody of Maternal Grandparents and Mother, the Child is hesitant to say things out of fear of retribution if Father would find out he communicated to Maternal Grandparents and Mother. (N.T. 5/5/2016 at page 163-164)

78. Father refers to Mother as a "junky" when speaking to the Child. (N.T. 5/5/2016 at pages 55-56)

79. The Child related to Mother that Father calls her a "junky whore". (N.T. 5/5/2016 at page 166)

80. The Child gets very scared when Mother and the Maternal Grandparents come to Court. (N.T. 5/5/2016 at pages 166-167)

81. The Child fears he will not ever see Mother or Maternal Grandparents again after court. (N.T. 5/5/2016 at pages 166-167)

82. The Child knows Father and Mother do not get along. (N.T. 5/5/2016 at page 167)

83. Father told the Child by the age of ten he will have nothing to do with Mother or Maternal Grandparents. (N.T. 5/5/2016 at pages 196 and 231-232)

84. The relocation would not enhance the quality of the Child's life at all. (N.T. 5/5/2016 at page 221)

## CONCLUSIONS OF LAW

1. Father's proposed move to Downingtown, Pennsylvania, is a relocation as defined at 23 Pa. C.S.A. §5322(a).

2. Father failed to establish that his proposed relocation is in the best interest of the Child.

3. The custodial arrangement fashioned by the Court is in the best interest of the Child, whether Father relocates to Downingtown, Pennsylvania, or chooses to remain a resident in East Earl, Pennsylvania.

## DISCUSSION

The Court hereby incorporates its Findings and Order dated May 17, 2016, herein. Father's position, as stated by counsel at the inception of the hearing, was essentially that it was spurious to characterize Father's removal from East Earl, Pennsylvania, to Downingtown, Pennsylvania, as a "relocation" as that term is defined in the custody statute. The Court thoroughly discussed (in pages 2. through 9. of the Court's Findings) why the Court found that Father's removal met the definition of a "relocation" found at 23 Pa. C.S.A. § 5322 (a). The fact is that the relocation would markedly increase the amount of time that the Child spends in transit between Father's residence and Mother's/Maternal Grandparents' residences. It is a change in a residence of the Child which significantly impairs

-16-

the ability of a nonrelocating party to exercise custodial rights. 23 Pa.C.S.A. § 5322. That is time which is lost to the Child. For this Child, a six year old boy who has mental health concerns, the increase in time spent in travel would inevitably cause him stress and fatigue. The term "custodial rights" must encompass more than the Child's mere presence in the company of the party who is exercising such rights. Rather, an effective "exercise" of "custodial rights" subsumes that the Child is predisposed to participate in the exercise of such rights. While it would be unrealistic to suggest that every child must be in perfect mental and physical condition every time he or she is delivered to a party who is entitled to exercise custodial rights, it would be a mistake for this Court to institute a system of periods of physical custody which unnecessarily and gratuitously diminishes the Child's capacity to fully profit from and enjoy the time he has with those who care most about him. The Court stands by and affirms its determination that, under the particular facts and circumstances of the present case, Father's proposed removal is sufficient to be labeled a "relocation" and, when the same facts and circumstances are tested under the statutory relocation factors, the Court's decision to deny approval of the relocation is correct.

With any child custody case, the paramount concern is the best interest of the child. This standard requires a case-by-

-17-

case assessment of all the factors which may legitimately affect the physical, intellectual, moral, and spiritual well-being of the child. In addition, with regard to issues of credibility and weight of the evidence, the reviewing court must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. *J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa.Super. 2011)(citation omitted).

The Child Custody Act states at 23 Pa. C.S.A. § 5338 (a): "Best interest of the child. - Upon petition, a court may modify a custody order to serve the best interest of the child." As the Court noted in its May 17, 2016, Findings and Order, a custody order is modifiable without proof of a substantial change in circumstances where such a modification is in the best interest of the child. *See Jaindl v. Myers*, 520 Pa. 147, 553 A.2d 407 (1989)(per curiam); *Martin v. Martin,* 386 Pa.Super. 328, 562 A.2d 1389 (1989).

In the present case, the Court was required to, and did, consider both the child custody factors outlined at 23 Pa. C.S.A. § 5328 (a) and the additional factors in respect to a relocation outlined at 23 Pa. C.S.A. § 5337 (h) to determine what custodial arrangement is in the best interest of the Child.

Father claims the Court erred in awarding primary physical custody of the Child to Mother and Maternal Grandparents in the event Father proceeds with his relocation to Downingtown,

-18-

Pennsylvania. (In the event Father continues to reside in East Earl, Pennsylvania, the Court's Order provides that Father would retain primary physical custody of the Child.)

This Court's experience and training indicate that the Child would suffer serious and damaging trauma should he be deprived of his relationships with Mother, the Maternal Grandparents, or his baby half-brother, as he would be should Father's role in his life be curtailed. The Child's relationship with the maternal side of his family must be sustained for the Child to grow and mature in a healthy manner.

The evidence was overwhelming that Father continues to harbor an animus toward Mother as well as toward the Maternal Grandmother. His repeated attempts to "poison" the Child's relationship with the maternal side of the Child's family are horrifying. Father's purported rationale for his relocation lacks authenticity. The paternal grandfather's convenience store business has been a small part of the picture of Father's life for many years; it was there long before the Child was born. While Father may have at one time been more involved in its operation than he is now and as he expresses that he wishes to be in the future, Father has been self-sustaining through the operation of his own convenience store in Honeybrook, which is proximate to Father's residence in East Earl and to the residences of Mother and the Maternal Grandparents. Father

-19-

intends to extend his lease there for at least another decade. At the same time, Father's current nexus to his father's business is tentative at best. Father testified that he does not know whether he has any ownership interest in his father's Norristown convenience store business or real property. Unlike his primary business, Father has no assurance that he will own or control the Norristown convenience store in times to come. Under the present circumstances, Father's plan will result in his moving farther away from his primary business and source of income so that he will be able to travel more conveniently to the locus of a nominal source of income to which he has only a tentative connection. This scenario lends credence to the theory that Father is most interested in putting distance between the Child on the one part and Mother, the Maternal Grandparents, and the Child's baby half-brother, and that this interest of Father's has increased in intensity as the Child has become more and more bonded to Mother and the baby half-brother.

Father provided no supporting evidence to prove that he or the Child would reap any measurable benefit if the Court approved his relocation to Downingtown. Of great significance, all indications point to Father's decision to relocate as a direct response to Mother's return to the Child's life and his desire to eliminate, or at least minimize, Mother's and Maternal

Grandparents' role in the Child's life. For that reason alone, Father's relocation is a sham.

The procedural history set forth at the beginning of this opinion illustrates the substantial degree to which this Court has had notable involvement in the Child's case for nearly six years. The Child faces momentous challenges arising from his parents' disparities in age, cultural background, and religious systems. These challenges are aggravated by Father's unrelenting determination to claim the Child as solely his.

This Court's persistent approach has been that the Child deserves the benefit of having both elements of his culturally and religiously diverse heritage understood by him and appreciated by him and by those who are significant to him (notably, his parents, his half-brother, and his grandparents on both sides). For a significant period, this balance was maintained between Father and the Maternal Grandparents because Mother had fallen victim to drug addiction. Mother has grown tremendously as a person over the past year and a half. Unfortunately for the Child, Father perceives Mother's rehabilitation, maturation, and growing sense of responsibility as a threat to his plan to monopolize the Child culturally and spiritually.

Because of Father's patent and latent strategy to alienate the Child from Mother, his half-brother, and the Maternal

Grandparents, it is certain that Father would have devotedly advanced his cause to curtail the involvement of these relatives in the Child's life if the Child were to move with Father to Downingtown. The Court sought to mitigate this outcome by granting primary physical custody of the Child to Mother and the Maternal Grandparents in the event Father proceeds to move to Downingtown, as the Court is equally certain that Mother and the Maternal Grandparents are committed to supporting Father's continuation of his role in parenting the Child in that circumstance.

At this late stage in these proceedings, Father suggests that the Maternal Grandparents lack standing to be granted primary physical custody of the Child and that no standing determination was made by the Court. An Order was issued which granted the Maternal Grandparents' Petition to Intervene on October 25, 2011. The Maternal Grandparents' petition was unopposed by Father. The same Order also granted primary physical custody of the Child to the Maternal Grandparents. An Interim Order dated February 22, 2012, continued primary physical custody of the Child with the Maternal Grandparents. It is unquestionable that the Maternal Grandparents have stood *in loco parentis* to the Child since his birth. The Maternal Grandparents have, and have had, standing pursuant to 23 Pa. C.S.A. § 5324 (2) to pursue any form of custody in respect to the Child. Father's

-22-

suggestion of error in respect to the Maternal Grandparents' standing is untimely as it was not raised at any time in this case prior to the present appeal. As such, Father waived and failed to preserve on appeal any potential error by this Court in respect to this issue. *R.M.G., Jr., v. F.M.G.*, 2009 PA Super 244, 986 A.2d 1234.

## CONCLUSION

For all of the above reasons, the Court suggests that Father's appeal lacks merit. It is respectfully suggested that the Findings and Custody Order entered May 17, 2016, should be affirmed.

BY THE COURT:

JEFFREY J. REICH, JUDGE

Dated: July 27, 2016

ATTEST:

NOTICE OF ENTRY OF ORDER OR DECREE
PURSUANT TO PA. R.C.P. NO: 236
NOTIFICATION - THE ATTACHED DOCUMENT
HAS BEEN FILED IN THIS CASE
PROTHONOTARY OF LANCASTER CO., PA
DATE: 7-28-16

-23-

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

D████ B████
          Plaintiff

                    v.

L████ M. F████
          Defendant

                    v.                              No. CI-10-02282

J████ F████ and
B████ F████
          Additonal Defendants

# FINDINGS

Upon consideration of the Defendants J████ F████ and B████ F████'s Petition to Modify Custody, and after a hearing conducted on October 24, 2014, at which the Plaintiff (hereinafter, "Father") was present and was represented by Neil L. Albert, Esquire, Defendant L████ M. F████ (hereinafter, "Mother") failed to appear (although she had been notified of the hearing),[1] and Additional Defendants J████ and B████ F████ (hereinafter, "Maternal Grandparents") were present and were represented by Rebecca S. Cheuvront, Esquire, the Court enters these Findings and Order regarding the child of Father and Mother, D████ G████ F████ (date of birth February 3, 2010, hereinafter, the "Child").

---

[1] Mother's whereabouts are presently unknown. There are presently outstanding bench warrants for her arrest in both Chester and Lancaster Counties.

# CUSTODY OF THE CHILD

In ordering any form of custody, the Court must determine the best interests of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child. See 23 Pa. C.S.A. § 5328 (a).

Based upon the testimony and other evidence admitted during the hearing, the Court makes the following findings in respect to the issue of custody of the Child:[2]

1.   *Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.*

Maternal Grandparents are more likely to encourage and permit frequent and continuing contact between the Child and Father than Father is vis-a-vis Maternal Grandparents. Father specifically requested at the hearing that Maternal Grandparents' periods of partial physical custody be reduced to one weekend per month. Maternal Grandparents are third parties and obviously are not parents to the Child. However, they have been a substantial presence in the Child's life since his birth. Their standing in respect to eligibility to be awarded periods of partial physical custody is beyond question.

---

[2] As Mother did not participate at the hearing, the factors will address only Father and Maternal Grandparents. Any reference to "parties" encompasses only Father and Maternal Grandparents. Further, this Order will establish there is to be no contact between Mother and Child until she successfully completes a drug rehabilitation program.

-2-

2.    The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

There is no indication of present abuse committed by any party. The Court notes that at the first hearing in this custody action, held October 20, 2010, February 15, 2012 and June 27, 2012, it was clearly established that Father exhibited extreme hostility toward Mother. He has completed an anger management class and has demonstrated an ability to control his temper; this may, in part be due to Mother not being in the picture, as Father candidly admitted that he dislikes Mother. It is hoped that Father will continue to demonstrate an ability to control his hostility.

3.    The parental duties performed by each party on behalf of the child.

Both parties are able to perform normal parenting duties.

4.    The need for stability and continuity in the child's education, family life and community life.

Both parties are capable of providing stability and a nurturing environment for the Child to excel in his education, family life and community life.

-3-

5. *The availability of extended family.*

Father has extended family in the area who are involved in the Child's life. Maternal Grandparents have been, and remain, extensively involved with the Child since his birth.

6. *The child's sibling relationships.*

The Child has a cousin on the maternal side of his family; However, he does not see this relative often.

7. *The well-reasoned preference of the child, based on the child's maturity and judgment.*

The Child is four years of age. Due to his tender age, the Court did not interview him.

8. *The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.*

Father continues, to a degree, to indoctrinate the Child about perceived incompatibilities between the Child's parents' racial, cultural, and religious heritages, rather than encouraging the Child to appreciate the richness of his diverse background. The Court is concerned that Father's approach will engender bigotry, at worst, or psychological dissonance, at minimum, in the Child. Maternal Grandparents remain open and uncritical in respect to the Child's mixed heritage. It is hoped that Father will come to demonstrate a belief system similar to

-4-

that of Maternal Grandparents regarding the Child's mixed ethnicity.

9. Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

Both parties are capable of maintaining a loving relationship with the Child. It is obvious to the Court that both parties love, even adore, this Child.

10. Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

Both parties are capable of attending to the daily physical, emotional, developmental, and educational needs of the Child.

11. The proximity of the residences of the parties.

The parties reside in sufficiently close proximity to each other that this factor is of no consequence.

12. Each party's availability to care for the child or ability to make appropriate child-care arrangements.

Both parties are able to care for the Child and to make appropriate child-care arrangements on a daily basis.

13. The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by

-5-

another party is not evidence of unwillingness or inability to cooperate with that party.

There continues to be conflict between Father and Maternal Grandmother. Maternal Grandfather is able to maintain a civil and decent relationship with Father and vice versa. There remains a concern that Father continues to disparage Mother to the Child. Mother admittedly has behaved in a notably flawed manner, but Father's practice is harmful and must cease for the best interest of the Child.

14. *The history of drug or alcohol abuse of a party or member of a party's household.*

In the past Father struggled with alcohol. That is not a concern today. There is no history of drug or alcohol abuse with regard to Maternal Grandparents. Mother's heroin addiction poses challenges for the Child and all of the adults who are significant in the Child's life.

15. *The mental and physical condition of a party or member of a party's household.*

Mother's continuing heroin dependency must be treated. There is no mental or physical condition with regard to Father or Maternal Grandparents.

16. *Any other relevant factor.*

Father has assumed substantial responsibility for rearing the Child due to Mother's absence. Maternal Grandparents

-6-

continue to be a safe harbor for the Child and provide a balancing influence in the Child's life.

# ORDER

AND NOW, this 4th day of November, 2014, the Court enters this Custody Order regarding the Child of Father and Mother, D████ G██████ F████████ (date of birth February 3, 2010; hereinafter, the "Child").

1. Father and Maternal Grandparents shall have shared legal custody of the Child such that each party shall have the right to participate in the major decisions affecting the Child, including, but not limited to, medical, religious and educational decisions. Father and Maternal Grandparents shall provide each other advance information on a timely basis regarding the Child's school or other programs and events.

2. Father is granted primary physical custody of the Child.

3. Maternal Grandparents are granted partial physical custody of the Child as follows:

(a) On alternating weekends, from Friday at 10:00 a.m. until Monday at 10:00 a.m., in conformance with the schedule established by the existing Custody Order.

(b) On every Wednesday, from 6:00 p.m. until Thursday at 6:00 p.m.; and,

-7-

(c) At such other times as the parties may agree.

4. Mother shall have no contact with the Child until she provides proof to Father and Maternal Grandparents that she has successfully completed a drug rehabilitation program and she demonstrates complete freedom from the use of illegal drugs or licit drugs for which she does not hold a valid prescription.

5. During the summer, Father and Maternal Grandparents shall each be entitled to two (2) non-consecutive weeks of vacation with the Child. Each vacation week selected may be tacked on to the party's weekend so as to amount to a maximum of ten (10) consecutive days. Each party shall provide written notice to the other party of a desired vacation period a minimum of thirty (30) days in advance of each such vacation period.

6. Holidays periods of physical custody of the Child shall continue per the prior agreement of the parties regarding holidays.

(a) Father's holidays are as follows:

(i) Maha Shivratri - the day of the holiday at 10:00 a.m. until 10:00 a.m. on the following day.

(ii) Holi - the day of the holiday at 10:00 a.m. until 10:00 a.m. on the following day.

(iii) Krishna Janmashtami - the day of the holiday from 12:00 noon until 12:00 noon on the following day,

-8-

(iv) Ganesh Chaturthi - the day of the holiday from 12:00 noon until 12:00 noon on the following day.

(v) Vijaya Dashami (Desera) - the day of the holiday from 10:00 a.m. until 10:00 a.m. on the following day.

(vi) Diwali - the day of the holiday from 12:00 noon until 12:00 noon on the following day.

Father will provide the dates of these holidays to Maternal Grandparents by December 31 of the year preceding the holidays.

(b) Maternal Grandparents holidays are as follows:

(i) Easter - from 10:00 a.m. on Good Friday until 10:00 a.m. on the Monday after Easter Sunday.

(ii) Christmas - from 10:00 a.m. on December 24 until 10:00 a.m. on December 28.

(c) Independence Day and Thanksgiving will alternate from year to year, with Father having physical custody of the Child during odd years and Maternal Grandparents having physical custody of the Child during even years from the day of the holiday at 10:00 a.m. until 10:00 a.m. on the following day.

(d) Labor Day and Memorial Day will alternate from year to year, with Father having physical custody of the Child during even years and the Maternal Grandparents having physical custody of the Child during odd years, from the day of the holiday at 10:00 a.m. until 10:00 a.m. on the following day.

-9-

7. Each party shall encourage the Child to have significant contact with the other party.

8. Each party shall make certain that the Child is on time for the transfer of physical custody from one party to the other party.

9. Each party is encouraged to accommodate the reasonable requests of the other party for alterations of any agreed upon schedule, as the circumstances and the best interest of the Child requires.

10. Unless otherwise agreed by the parties, the party receiving physical custody of the Child shall provide transportation for custody exchanges.

11. The Court directs that the Child shall continue to attend counseling at TeamCare Behavioral Health, LLC, 1808 Colonial Village Lane, Suite 103, Lancaster PA 17601. In respect to such counseling:

(a) To the extent requested by the counselor, the parties shall invest themselves in such counseling so as to enhance their personal skills to enable them to parent/guide the Child in a healthy and positive way.

(b) The Child shall continue with counseling for so long as the counselor deems it reasonably necessary.[3]

_____

[3] The Court requests that the counselor notify the Court, in writing and with copies to both parents, when the counseling terminates, with such notice to include a brief assessment of what the counseling has accomplished.

-10-

(c) All costs for the counseling shall be shared equally by the parties (to the extent that said costs are not deferred by insurance available to either party).

12. The Court suggests, but at this time does not order, that the parties engage in co-parenting counseling. In the event the parties agree to attend co-parenting counseling, the Court directs that Maternal Grandparents shall be responsible for the cost of such counseling to the extent said costs are not deferred by insurance available to either party.

## FUTURE RELOCATION

IF YOU ARE PROPOSING TO RELOCATE TO ANOTHER AREA WITH THE CHILD NAMED IN THIS ORDER, YOU MUST COMPLY WITH THE REQUIREMENTS OF SECTION 5337 OF THE PENNSYLVANIA CUSTODY LAW WHICH INCLUDES SENDING NOTICE OF YOUR PROPOSED MOVE TO EVERY OTHER INDIVIDUAL WHO HAS CUSTODY RIGHTS TO THE CHILD AND PROVIDING SPECIFIC INFORMATION CONCERNING YOUR RELOCATION. THE LAW MAY BE FOUND AT 23 Pa. C.S.A. § 5337. IF YOU DO NOT COMPLY WITH THE NOTICE PROVISION OR PROVIDE THE REQUIRED INFORMATION, THE COURT HAS THE ABILITY TO CONSIDER YOUR FAILURE AS AN ELEMENT IN THE CUSTODY OR RELOCATION DECISION.

-11-

BY THE COURT:

JEFFREY J. REICH
JUDGE

Attest:

Copies to:

Neil L. Albert, Esquire
Zimmerman, Pfannebecker, Nuffort & Albert, LLP
22 South Duke Street
Lancaster PA 17602

Rebecca S. Cheuvront, Esquire
Law Offices of Robert C. Wee and Rebecca S. Cheuvront
Suite 212
8 North Queen Street
Lancaster PA 17603